Our next case for argument is Hinton v. HHS, appeal number 23-2161. Ms. Wade, please take your time, but you can proceed when you're ready. Ms. Wade May it please this court, my name is Zoe Wade and I represent the Secretary of Health and Human Services. As this court knows, this case turned on a single finding of fact, that Shonquavia Hinton received a flu vaccination on December 21st of 2015. And I'm asking this court to set aside that finding under the arbitrary and capricious standard of review, because the special master did not explain, did not rationally explain her choice to reject multiple contemporaneous records created by disinterested persons and instead credit the later in time statements made by an interested party in the context of litigation. The medical records and the contemporaneous records have been recognized by this court as generally warranting consideration as trustworthy evidence. And the records, excuse me, the evidence that was credited by the special master has been recognized both by this case, excuse me, this court and the United States Supreme Court as being deserving of little weight. And yet the special master devoted no time to explaining why she found those contemporaneous records to be unreliable or not credible. And it is not the government's position... Are you asking this court to re-weigh the credibility determinations of the special master? I am not. I am asking this court to review the record under the arbitrary and capricious standard of review, which requires this court to consider whether or not the special master drew plausible inferences and whether the special master articulated a rational basis for the choice that she made. If you are asking us to not re-weigh the credibility determination, which I read as being based on both the detailed nature of the testimony as well as, I guess, the demeanor of the witness as well as, you know, other explanations provided and, I guess, the extreme nature of the attempt she made in order to be able to show that the flu vaccine was actually received. If we don't re-weigh that, where does that leave us? I mean, we have to accept the testimony as true then, right? Of the witness. No, if the court determines under the arbitrary and capricious standard of review that the special master did not rationally explain her decision or that the inferences that flow from her fact-finding are essentially erroneous, then this court is statutorily... It's unreasonable, not erroneous. I'm sorry, what's that? You said if the fact-findings are inferences, don't the inferences have to be unreasonable? Yes, or implausible. Okay, that's not quite the same as erroneous. Well, that is the standard for determining error, though. I agree. You said erroneous. You said erroneous, so I just wanted to make sure we were on the same page.  You've got a very difficult verdict. It is a difficult verdict, but I do think here that the record is very clear that she did not explain why she found... Didn't resolve the conflict. She didn't resolve the conflict at all. She explained why... Didn't resolve the conflict. So the court claims that you didn't cite any authority to support your proposition, that she was required to explain how she resolved the conflict. Well, I'm reading from page 18 of the opinion at page 20. And I disagree that... Well, cite me a case. Well, a case that would suggest that the court has to... You made the argument to court-vetted claims that there was an error here, arbitrary and capricious, because the special master did not explain how she resolved conflicts in the testimony. Court-vetted claims said you failed to cite any authority supporting that proposition. Well, I would suggest that probably the most persuasive case on that particular point is going to be Sanchez versus Health and Human Services. And in that case, the special master credited... What is the cite? Pardon me? What is the cite? Do you have the citation? It is in... I do have the cite in the Sanchez versus Health and Human Services. If you're trying to talk to us, you have to talk for the microphone to pick you up. It's 34-4-1350. It's a federal circuit decision from 2022. 34-4? Yes. And? 1350. And what does that extend? Let me ask you another question. What is that case? Do you want to tell us?  The special master in that case essentially credited the testimony of family members regarding a minor child's symptoms and specifically credited testimony that he exhibited arm contortions close in time to the time of vaccination. He also credited later-in-time testimony that was supported by medical record evidence that the child experienced arm contortions several months later in time. But he rejected the testimony from the family members that during the intervening months that this child continued to experience these arm contortions. And this court held that it was arbitrary and capricious to reject the testimony of the family members because the special master did not provide a sound basis for rejecting that testimony. And importantly, the court determined that the special master in that case was not obligated to accept the testimony simply because it was unrebutted. It was specifically the fact that he did not explain his reasoning for rejecting that testimony when he had previously accepted other aspects of that testimony. Why did the government initially decide not to defend this case? The government did not decide not to defend this case. The government did defend this case on a fact finding. And it's a real wrong foresee letter that we're not going to defend. I think it's a misconception that once the special master had issued its fact ruling and determined that the child had received the vaccination, that was the primary point of contention. So we did dispute that. Once that finding was issued against the government, then there were no other defenses for the respondent to raise. Do you want me to interpret that? That's absolutely how it's going to go. Just as we did, I'm not going to defend. Prior to that being issued, the procedural history would be that there was a Rule 4 report that contested entitlement based on the fact that the evidence was insufficient to support that a vaccination had occurred. Then there was a fact hearing based on only to decide that one issue, whether or not a vaccination had occurred. So that would be standard practice in our office if there's an adverse determination and there are no other grounds to defend against the case. So it was unclear because there's only one reference to the foresee and I thought that was the only one. Apologies. Secondly, let's assume for purposes of argument that there is no question whatsoever about that. Ms. Hinton did go on December 21st for a meeting with her child. I'm sorry. Let's assume hypothetically, and I know the government doesn't like hypotheticals. Let's assume hypothetically that it is agreed that Ms. Hinton's record absolutely proves that she went to the meeting on the 21st of December with her son. Okay. So she went there with the doctor. What does that tell us? Does it tell us anything about the likelihood of whether or not the vaccine was administered? I think it's a little bit difficult for me to answer that because these are fact-dependent questions and you're asking me to assume a single fact. I think there's in the record evidence that it was typical at this time of year to give a flu vaccine. Certainly. So all I'm saying is you have a situation where it's proven, yes, indeed, she did come. The doctor said, I remember she came. Okay. Am I also to assume that a vaccination was administered during this? No, that's the question. So assuming hypothetically that there is evidence that they went to the doctor for that. Sure. Do you still have an argument? Yes. I think that there is still contemporaneous evidence from the time of his hospitalization. Ultimately, in this case, the only evidence that a vaccination occurred is the statement of Ms. Hinton that were made after she retained an attorney to bring this claim in the vaccine program. So that's a fact. Well, that's a medical record. Your argument is that she made the medical records? The medical records that were made during the rehab period. No. If she attended the appointment on the 21st of December, but we still did not have evidence that there was a vaccination administered, you would still have an absence of any record in the billing or insurance documentation that a vaccination was administered. There's still no testimony other than the statements of Ms. Hinton. For example, Dr. Oliga did not recall. And there is an understanding that medical records are not necessarily proof positive of things plus or minus. I'm not sure that I would agree with that. There is a general assumption that information that is provided during the course of a medical appointment is going to be accurate. And even if there was an appointment on the 21st, which obviously we dispute, we have contemporaneous records from his hospitalization that affirmatively demonstrate that he did not receive a flu vaccination. We're looking at the quality of the documentation for a visit to a doctor on the last day of his day in private practice, on the last afternoon, just before he's going home. We are talking about far more than that. This is not simply a matter of... Not just we are. That much, at least, we're talking about. Yes? No. I disagree with your characterization that we're talking about simply the accuracy of medical records that may sort of plus or minus be accurate or not. I think that we also have to... The separate issue here is that the inferences that flow from the special master's decision to credit Ms. Hinton's testimony are simply not... They are objectively unreasonable. Okay, so you have two arguments as far as I see. Yes, that's correct. One is that the inferences made are unreasonable. That's correct. And the other one is that there's not a reasoned basis. Can I ask you something turning first to the reasoned basis? Is it your position that there's things that the special master could have said? For example, if the special master would have said something like, the only evidence on the record, the main evidence, is that of the testifying mother, Ms. Hinton, and she said that the nurse, when she gave the vaccine, took notes by paper. And she said that when she came in to the doctor's office, the check-in procedure was, for lack of a better word, loosey-goosey in that you didn't have to formally check in. And so, if the special master cited this kind of evidence and said, based on this, I don't think that this is a situation where I have to say that the medical records necessarily would have been kept perfectly. Especially where there is absolutely no evidence from the practitioner or anybody else about the quality of the records that were made by this particular doctor's facility. Would that be a reasoned basis? Or is it your position that there's no reasoned basis at all? Because we should presume, as a matter of law, that the absence of certain records and the existence of certain records is absolutely something that the special master has to understand to be accurate. Certainly, we are not suggesting that, as a matter of law, the special master was required to credit medical records over later time. Lack of medical records. Sure. But I would disagree with the characterization that certainly there are circumstances where the facts would support a determination that a medical record was not kept in an accurate place. I understand what you're saying, there's facts. Okay, go ahead. I don't want to make sure you answer the question of whether I think there's a possible reasoned basis on this record. First of all, there's no reasoned basis whatsoever. The record is silent. But if we assume what you suggested, I think that we still have the inferences that are unreasonable to draw. It's hard because there isn't an actual explanation. Why don't you list those unreasonable inferences? In order to infer, obviously, the special master would have had to have inferred that the person at the front desk did not accurately record that Shantavious presented for his appointment. She would have erroneously documented him as a no-show. But you would also have to infer that Dr. Alligood would have failed to keep a record of a patient encounter, which he is required to do under North Carolina law, and which he testified there was no situation in which he would not create a medical record. So you would have to reject that. You would also have to infer that he did not keep a vaccination record, which is required under Section 25 of the Vaccine Act. Dr. Alligood said, Austin, he does not provide the flu shots. And that while he would know of it, someone else would be providing that record. Is that correct? Any health care provider, a pharmacist, the nurse, whoever administers. So you would have to assume that a vaccination record was not created by a health care provider in contravention of the statute. The other aspect, now I agree with you that the special master credited Ms. Hinton's testimony because she said it was extremely detailed and fact-specific, and specifically in terms of the account of the events that occurred on the 21st. And one of those accounts of what happened, what transpired during that appointment, was she claimed that she refilled her son's Trazodone prescription in a face-to-face conversation. She described a conversation with Dr. Alligood about having only a few pills left, and she explicitly Is there a medical, is there any record? I know there's a record that a call occurred on December 21st. That's correct. But, ma'am, is there a record that that call was made not to say, hey, I was just there two days ago. Indeed there is. And could you The record itself. Please don't interrupt me. I want to make sure. Your case is very important to me. I apologize. So I want to make sure that I'm able to ask you my questions. Please don't interrupt me.  Because what I want to say is this, is I think it's not unheard of for somebody to have to call a doctor's office a couple days after a visit to say, hey, I never got that prescription you said you were going to fill for me. I don't think that that's unheard of. And so where in the record does it say that there was a call to request a prescription versus a call to I mean, you understand what I'm concerned about. I do. I'm not sure the record, where does the record clearly say, you know, this call is because, you know, they needed a refill only, not to remind us of a refill. I know. I looked at the record. I don't, the page. The record specifically references an incoming call from Ms. Hinton to request a medication refill. That's correct. And in order How do you know that that's not a reminder? She denied placing a call to request a prescription refill. She said I don't know. No. Her testimony specifically, on page 141 and 142, question, did you call Dr. Oliver's office on December 23rd, 2015 to request a refill of the traciderm? No. Answer, no. So you do dispute the medical record. Answer, yes, I did. So you're saying you did not call Dr. Oliver's office to request a prescription refill on December 23rd. Answer, no. Correct. She's saying, it says you're saying you did not call. She did not call. No, no, no. Please look at page A142, lines 22 to 25. I agree that you are correct that at first she said I didn't, but then she changed it and she said, she answered a question that was, you did not call, and she said no. Suggesting she did call. I don't agree with your Witnesses are allowed to change their mind. I don't agree with the characterization of this record. I'm just reading the question. Maybe I'm wrong. I think, and respectfully, I do think you are incorrect. I do believe so.  Careful, careful. Please stop interrupting the evidence when they're asking questions. I am. You're talking in terms of genocide. I absolutely apologize. My concern is about running out of time. I'm going to read this testimony. I'm going to read this testimony.   As someone who is not engaged, you should stop apologizing and stop interrupting. If you stop interrupting, you won't have to apologize. Thank you. I'll read the testimony to me, and then you tell me if it's accurate or how you're understanding it. The question, so you're saying you did not call Dr. Ellicott's office to request a prescription refill of, I'm not going to say the medication, on December 23rd, 2015. And the answer is no. Now, why isn't that a yes? Because if we look to the preceding, the beginning. Is there a follow-up question? It's a preceding question. On page 141 by Ms. Hartley, question, did you call Dr. Ellicott's office on December 23rd, 2015 to request a refill of the trazodone? Answer, no. Okay, so you do dispute the medical record. Answer, yes, I didn't call Dr. Ellicott. This later statement that you're referring to is counsel reaffirming that that is, in fact, her testimony, that she did not call Dr. Ellicott regarding that trazodone prescription. But the answer would have been yes, wouldn't it? I don't think that's how she understood it. In deciding these cases, Ms. Wade, there's always some evidence that points against the petitioner. And there's evidence that points the other way. So it's a balance. So let's just assume, reverse of argument, you're right on this particular issue. This is one episode that's not helpful to Ms. Hinton. Let me just back up to the law we have here. We generally like to treat medical records as being accurate. Our course law over the years has recognized there's no presumption that that's true because mistakes happen, right? No, I would disagree with that. Some medical records are either inaccurate, incomplete, or somebody forgets to put one in. Otherwise, we would have a rule that says medical records are presumptively correct. I think that there is a general, the medical records, because statements are provided for purposes of treatment and information is documented with diagnosis and treatment hanging in the balance, there is a presumption that the information contained in medical records. It is not an irrebuttable presumption. I think in Kirby, this court rejected the presumption that the records that are silent are necessarily indicative that the record contains all of the medical ailments that a person might be experiencing. And in that case, the court made a specific, I guess, illustration that a patient who presents to a doctor for a heart attack is unlikely to mention, for example, that they're experiencing a runny nose, nor is a doctor likely to document that. So they're not necessarily presumed to be complete. But I would submit that when Shonquavius Hinton was being treated for GBS, when he was hospitalized for the inability to walk, that at that point in time, the information that is contained in those medical records, that would have been at the peak, I guess, relevant for his diagnosis and treatment. And there are not one but two affirmative representations. Well, when he came to the hospital in January, he wasn't being treated for GBS. That's correct. They hadn't made the diagnosis. That's correct. His first symptom occurred. Certainly. At that time, right? All I'm trying to get at is that I think, as a general proposition, medical records are obviously preferred and probably maybe, are they presumptively correct? Is that what you're trying to say? I think that when there is affirmative, this court has recognized that the absence of a reference in a medical record is far less significant than a reference that negates the existence of a condition or circumstance. And here we have multiple. We have obviously the original record from December 21st indicating that Shonquavius was a no-show. Crediting that, we would assume that no vaccination took place. Let's assume so you can see where I am. I think the record is sufficient to support the fact that she showed up on the 21st. And I'm going to tell you the reason why. I'm not going to let you argue against it. I'm going to start with that proposition. So the question came up about October 21st. The doctor said, oh, yeah, I remember. First there was a meeting in August. It was August and then December, right? There was an appointment in July. There was an appointment in August. July, August. And then the question is, is there going to be one later to come back and get the pills or whatnot? So the question is, did it occur on the 21st? And the doctor says, yeah, I remember about that time. He remembers meeting after August. He clearly says, I remember meeting with her when he says around that time. It has to be after the August meeting. So that's where Clevenger is. And then I say to myself, there was evidence of the record about, she says at that meeting on the 21st, he told me about his future plans. He told me he's going to go to a private practice over someplace else in North Carolina, right? She says that's what he told me. He testified that he told her at that meeting, whenever it was, after August, that he told her about his future plans. That's in the record. So I'm saying there is, to me, since he says I didn't have that meeting, and at that meeting we talked about something very specific, and he agrees that they talked about that specific thing at that meeting, whatever happened. She says it was the 21st. I'm ready to say it happened. Okay? So I'm willing to throw out the no show. I put the no show in the balance. Given our standard of review, we are not the fact finder. I'm just saying. So in the record, I have clear evidence that he admits that he met with her, and he isn't disagreeing it was the 21st. He didn't say it couldn't possibly have been the 21st. So I'm saying the meeting happened on the 21st. So that throws the no show record out. So then what's left is we have four medical records, two of which indicate the vaccine was not given, and two of which indicate that it was given. Right? Which records? We have the medical records. I'm talking about real medical records now. I'm not talking about hospital, but I'm talking about whether or not he got the vaccine, which is the key question. I'm not sure I appreciate the distinction between the medical records and hospital records. Well, whether or not she got her prescription refilled is irrelevant to the question of whether or not the vaccine was given. The only evidence in the record about whether the vaccine was given, documentary evidence about the delivery of the vaccine, and evidence that's in the record, is the two statements that happened when they went in at the hospital, right after in January, February, and those two records indicate that there was not a vaccination. Correct. And then later in the rehab in April or whatever, right, after she's retained counsel, she goes in and there are two records that indicate the vaccine was given, based on what she told the person who's writing stuff down. Correct. But that is a medical record, and it was written down. Correct. The person that wrote it down didn't say, well, are you really sure about that here? Let me go look at the records. They accepted it as true. Her testimony has been validated 100% truthful. The special master made a demeanor-based credibility assessment that this woman tells the truth, and that this woman has a fantastic memory, yada, yada, yada, okay? So those two pluses for Ms. Hinton are really strong. Okay. And really strong, and that's going to wipe away when he says she's got perfect recollection about what went over. That's going to wipe out any other evidence of anybody who's trying to work that. If I may? Yeah. If we assume that that is true, and I agree that the special master did credit her testimony whole-heartedly, we also have to credit her testimony that she did not contact Dr. Oligod to request a refill of her son's prescription. So we have to infer that Dr. Oligod not just that he just simply didn't create a record of a patient visit, didn't create a vaccination record, didn't bill for services performed, didn't seek reimbursement from insurance for the services that he performed that day, but also that two days later, somebody in his office created a phone record of a phone call. You didn't put any evidence. You didn't put any evidence at all, right? No. You had no direct witnesses at the trial. There was a fact hearing, and then there was a deposition of Dr. Oligod. So there was a fact hearing. So you didn't propose a witness coming in on behalf of you. You basically cross-examined. I'm not sure that I understand that. The doctor gave a deposition. He did, right? That's right. And who called him for the deposition? I believe it was the petitioner's attorney. So one possibility would be that you felt that the evidence was so strong that you made a strategic decision to not bring somebody in, say, from, is it VDANT? Is that the name of the medical provider? They're pretty much a company. Yeah. Like you could have brought somebody in to testify, for example, and talk about how that particular facility at that location, I don't know anything about it because there's nothing in the record, but that it was one that had 100% accurate or 99% accurate record keeping or something. I think there was a strategic decision, obviously legitimately made, because I understand you have a strong case for this. You really did. I totally understand that. It's a very strong case. So a decision seems to have been made to just rely on the cross-examination of Ms. Hampton. Is that correct? I'm not sure that I would characterize it that way. Okay. But was evidence provided? Did you provide evidence about how VDANT, in that location, there was somebody to talk about the great records that they keep? There was no custodian of records. The records, once they are obtained and filed, usually come with a certificate of service that they are essentially maintained in the way that the provider ordinarily keeps those records. So lack of records, for example? Do we give a presumption of validity to a lack of records? I guess we don't have a lack of records. We have an affirmative record that indicates that she did not show for the appointment. I hear you. You're also relying on the absence of a bill sent to Medicaid. You're relying on the absence of a notice sent to the state. And so I think, if I'm wrong, you are in fact relying on the absence of documents. So could you address my question now? I guess I'm misunderstanding the question. I apologize. I asked if there was a presumption that's provided to the absence of medical records or billing records. I'm not aware of a presumption that attaches to the absence of any evidence. Okay. Thank you. But I would submit that it's not simply, not only do we have an affirmative document that Ms. Hinton did not present for this appointment. That's the notion. That's the notion. When we get to February of 2016, the context of the records in which Ms. Hinton is reported to have indicated that her son did not receive the flu vaccination is worthy of consideration. Those are on pages 227 and 228. Ms. Hinton was present with her son and her son's father in the room with a team of residents, including Dr. Robin Collins, who took the history from Ms. Hinton. She attested to that. That is demonstrated in the records. He documented that according to the responses given by Ms. Hinton, that her son did not receive a flu vaccine. This is in January? This is in February. February. Yes. February 15th. That assessment was reviewed in the patient's room by the supervising physician in the presence of all of the residents, both of the parents and the child, on what are called family-centered rounds. While present, that supervising physician reviewed the assessment and examined Shunquavious Hinton himself and concurred that the assessment was accurate. It's your view that the special master acted arbitrarily and maliciously by not crediting that document over the contrary testimony of Ms. Hinton as well as the answer she gave later to the physical therapist providers, right? The specific ‑‑ I'm just trying to understand your argument. There are two. One is that she did not explain why she found any of those records to be uncredible. As in SANCHEZ versus Health and Human Services, I think that is sufficient to fail to explain why. I asked you earlier if you thought there was anything on this record that she would provide that you considered a reasoned basis and you said no. I agree with the reasoning in SANCHEZ versus Health and Human Services that in that case the special master did not provide a sound basis for their decision to reject the evidence and this court determined that the finding could not be reconciled with the record. I would argue that is true, too. It's your view that, again, it's your view I understand that the special master, by finding Ms. Hinton's testimony credible and crediting her account of what happened, was unable to provide a reasoned basis for why those documents were incorrect. Correct. I agree that while there is essentially a rebuttable presumption, it's not always the case that medical records are going to be accurate. But given the indicia of reliability that attach to contemporaneous records because of the circumstances under which they are made, that the special master had an obligation to explain its departure from this court's guidance on that and we don't have any recognition in the special master's decision that she even considered that the contemporaneous records... Did you cross-examine Ms. Hinton on why she gave those answers? In terms of which answers? Was Ms. Hinton cross-examined on why she gave the answers when she was in the hospital and her son was in the emergency room? She was. She denied that she gave that answer. She testified that she was asked. She, in fact, confirmed the circumstances that are described in the medical record that there were teams of residents around and that she was specifically asked, did you provide his medical history to the physicians on that day? And she answered, I answered what they asked me, yes. But she, according to her testimony, she advised a room full of residents and an overseeing physician that her son did receive the vaccination. And according to her, Dr. Collins wrote that down incorrectly in the assessment. So it was arbitrary and capricious for the special master to credit that  I believe it. Find it believable? I... So there's two parts, again. She didn't rationally explain why she rejected it. But I would also argue... The reason why I'm rejecting it is because I find her credible and she said that I gave a different answer. I don't think that, because this is not a situation where the records are  So the fact that she found Ms. Hinton credible is not a, does not speak to why she found these records incredible. And she did not explain, given the fact that they are created under these circumstances, it's just, I would, and this is obviously the argument that I'm I don't believe that the record as a whole really can be rationalized with her decision to credit Ms. Hinton because we have an affirmative record that they did not appear. Because the inferences from that include all of these other ordinary steps that it's frankly not plausible to assume that a physician is simply not going to create a record of a medical record. Judge Cunningham. Thank you. Judge Cunningham. My apologies. So it sounds like what you're contending is almost by definition you have to believe physicians or medical staff over ordinary lay people because of the steps that you say they go through in terms of how they document things. Can you tell me if that is your contention and if not, why is that? It is not my contention that there is an obligation. There is an expectation that medical records will be accurate. It is rebuttable. There are circumstances where a court can consider where the evidence suggests a scrivener's error. But my contention here is that this is far more than just a scrivener's error. Not only do you have to essentially presume that this doctor just failed to keep a record, didn't bill for his services, that there's a phone record that was manufactured documenting a phone call that Ms. Hinton swears she did not place, testimony which the special master credited. So you have to also infer that that phone record was simply manufactured by a member of Dr. Alligood's staff. But then you carry over, we have a completely separate medical provider that is not related to Dr. Alligood's office who is evaluating this child for Guillain-Barre Syndrome, which I would submit is more like the heart attack than the running nose. Dr. Collins was very interested in the history of this child, including whether he suffered any pre-existing viral syndrome or viral symptoms that might explain the onset of his polyneuropathy. They would have been interested, I'm sorry, just to clarify, they would have been interested in whether or not he received a flu vaccination because of the correlation between flu vaccines and GBS. So to suggest that they would have, in a room full of people, received information that he received a flu vaccination but then documented that incorrectly and that that assessment would be reviewed by a supervising physician who attested to his accuracy that he also would have made that mistake, that I think is, those are the unreasonable inferences that I'm referring to. At what stage in the proceedings did GBS become a table injury? I believe 2017. I believe 2017. I thought it was after the petition had been filed in this case. It would have been after the petition was filed in this case. And that would be after the time that the doctors were beginning to examine him for possible GBS? I think that's fair. Afterwards? Sure. Okay. But I will say that even prior to the addition of the flu GBS claim to the table, there were claims based on flu causing GBS in the vaccine program and there is literature.  And there is also literature that predates the addition. You have a situation where, I mean, you have this particular patient clearly has what sort of looked like a first symptom of GBS within the table time for the administration of the flu vaccine and you're kind of saying, well, what else caused the GBS? Well, there are a lot of other causes and, in fact, most of the times no cause was identified. But certainly what's, I think, important for our purposes is that the staff were interested in investigating his prior medical history, including whether or not he had any flu-like symptoms or signs of illness that would potentially explain the cause of it. I see that. Judge Cunningham. Thank you. Do you acknowledge that there's a link between the flu vaccine and GBS? It is not necessary for our purposes because it is a table injury, so causation is presumed in these circumstances, which is why there was no further attempt to defend against this claim. Okay. Thank you. Let's hear from Ms. Maglio. May it please the court. Jennifer Maglio on behalf of the appellee, Tramella Hinton, who serves with the guardian of her son, Sean. Appellee agrees with the power of the college. Let me ask a question, if I may. Your name is not on the brief. Are you related to the firm?   What is your relationship? Yes, sir. The federal circuit briefs were written by my firm. I was on sabbatical at the time that the briefs were written, so I am not on the briefing. However, I have returned from sabbatical. Okay, great. You're with Mr. Christian's firm. Yes, I am. Thank you very much. You're welcome, sir. Appellant objects to a single fact finding made by the special master and was confirmed by the court of federal claims. And that is the finding that we've discussed, that the flu vaccine was given on December 21st, 2015. As this court has pointed out, appellant seeks a reweighing of the evidence presented to the special master and asks this court to find that the absence of a medical record of the actual vaccination outweighs the other evidence that the special master relied upon. This argument is contrary to the Vaccine Act and to this court's precedent in two main respects. First, this court does not reweigh evidence or redetermine fact issues. Counsel? Yes. I hear the government's argument as being that there's a multitude of documents or absence of documents that you have to agree happened, like four or five missteps happened in this case. And that that's just too many missteps. And so the special master just was unreasonable in thinking that there could be so many, you know, there's the record of the no-show has to be correct. The failure to have a billing record is incorrect. The failure to have a record reporting the vaccine is incorrect. The failure to have documentation with a summary of the visit is incorrect. It's the multitude of these errors that had to have occurred for the special master to have made the finding that she made is the problem and what makes it arbitrary and capricious. Could you address that? Absolutely. So the special master did rely on a lot of evidence in the record. However, there is the contradictory evidence, which the special master acknowledged and discussed. And what Appellant has pointed out is that there are these implausible inferences. Appellant argues that these inferences arise from the decision. But the Powell case talks about, when it talks about implausible inferences, it talks about things that are in the actual decision, reasoning in the decision. Here we're talking about items that Appellant has found in their briefing but not actually in the decision. And those are the things we're talking about, the no-show record. And, again, if you look at Kirby, Kirby talks about how he acknowledges that physicians' records may be incorrect, that clerical mistakes can be made. And so with the evidence that corroborates that the doctor's office had no formal check-in procedure, there is supportive evidence for the notion that there was a clerical mistake made in the no-show record. There's no evidence that a clerical mistake was made. No. There's an allegation. That's your point. I would submit that it's speculation on either side. But there is corroborating evidence for that to have been a possibility based on the fact that both the doctor testified that he had no formal check-in procedure and the tenant testified that there was no formal check-in procedure. And the items that follow from that, those inferences that we're discussing that follow from that, the lack of billing records, the lack of vaccine administration records, those also follow from a no-show record. I mean, if there's no visit in the computer, I'm sorry. Part of the problem we have here is that there's no evidence in the record about the quality of record-keeping in Dr. Allegan's office starting at noon on the last day of his practice in that facility, right? So there's nobody. We don't know whether he was very, very accurate in the patients that he saw before 3 o'clock in the afternoon, and then it wasn't. We don't know that. Exactly. Exactly. We have a record that doesn't have a lot of information about any of the procedures, either the procedures of record-keeping in Dr. Allegan's office or in the hospital. And so what appellant has done in their briefing is filled in the gaps with assumptions of what happened and attributed those assumptions to the special master. Looking at the hospital record, which we've discussed today, Appendix 227 and 228, that February 15th hospital record, appellant has given a story of how, has given an explanation of how this occurred in rounds. There were many residents. The resident listened carefully. We don't have any testimony or any record that reflects that. The only record we have is the... Well, you heard your adversary's speech on this very topic about this February meeting. Was she making that up? She was... I mean, it was a little pejorative, but I mean, you're saying there was no testimony to that, of course? There's no testimony. The only thing we have are the pages of the actual notes. We have the written record. We have the written note. We don't have any testimony or any other explanation of how that record was created or maintained. We have Ms. Hinton's testimony. We have Ms. Hinton's testimony. I think the government might be relying on her testimony to describe... But we don't have, for example, the doctors who were examining the young man on this time. We don't have them on the stand saying, you know, I specifically, I looked at the records and I asked her, was he vaccinated? She said, no. None of that exists. Just the cold record, right? Absolutely, yes. And what we have in Ms. Hinton's testimony is Ms. Hinton saying she spoke with the interns. So Ms. Hinton simply says she spoke with the interns and they asked her if there was a flu vaccine and she answered yes. What the record in the medical record that we have in the appendix in the record is that this resident, not an intern, this resident, and it says, face-to-face, I reviewed, and she lists the items she reviewed with the family. And they're abbreviations. So, again, I am assuming that... What page are you looking at? 227, appendix 227. And it's about a third of the way down under the personally examined on 215. Okay. And it says, face-to-face, I reviewed the CCHPI, and it lists all these abbreviations, which, again, this is, I have to say, my assumption that CC matches lower down on the page where it says chief complaint. And so you see these abbreviations line up with sort of the section headings of the note. But there is a section heading that says immunizations, and that's the key item we're relying on in this note, and that is immunizations up to date did not receive flu vaccine. But the resident's note at the beginning does not say that she reviewed the immunizations. It says all the things she reviewed, but it doesn't say she reviewed immunizations. And so I would say that there are... We can all speculate as to what the resident did, but the only evidence we have is the testimony of Ms. Hinton, where she said she spoke with interns and told them that the flu vaccine had been given. And this note, that doesn't reflect, at least specifically, that the resident spoke with Ms. Hinton on the subject of immunizations. And so while there is a general presumption of... So the real question is, was there, from your client's perspective, was there a failure in the system to have recorded the vaccine being given? Correct. And we have plenty of case law in the history of the program that talks about how a special master can find that a vaccine was given even where there's no evidence or no medical record of the vaccination. And what the case law has talked about is that if there's some indication, some corroborating evidence that supports testimony that there was a vaccine, then there can be a finding that there was a vaccination. And here we have... So if I were to tell you that it had been clearly established and the government wasn't even challenging whether or not Ms. Hinton went with her son on the 21st for that afternoon appointment, what does that tell you about the likelihood of whether the vaccine was given? Again, we have only the testimony of Ms. Hinton that she observed the vaccine being given. We have... But there are also circumstantial evidence that Dr. Olin did statement that at that time of year, fall, winter, they would have provided a vaccine commonly? Yes. You were about to say that. Okay. We have that other evidence that is Dr. Oligan talking about how he remembers the visit. So hypothetically, the meeting could have happened and the doctor said we're likely to give those things, so then the issue is somebody forgot to record it. That's correct. And that is something that Kirby acknowledges can happen. The government's whole case would turn on, well, of course they recorded it because they always record that because they violate the law if they don't record it. As if a nurse sits there worrying about whether or not they're going to be indicted for failing to make that record. Precisely, Your Honor. And as if the nurse doesn't ever make a mistake. I mean, clerical mistakes are made, human mistakes are made, and that happens in doctor's offices. It certainly could happen, again, not in the records except for Ms. Hinton's testimony, but it could happen on a day that was the last day of the doctor's practice and as he was getting ready to move to a new job. And what? Do you make anything of the point I raised when your adversary first stood up, that according to federal claims seem to think that the government had failed to that requires a special master to explain her decision? Yes, and I would agree with you on that point, Your Honor. Well, I mean, the government has cited cases now and they cited cases in their brief to the contrary to that effect. But the case law that discusses the reasonable basis standard, I'm sorry, excuse me, the arbitrary and conclusive standard, that case law talks about having a rational basis for the decision, not a rational basis for each piece of evidence and how it's weighed. In fact, that case law is very specific that this court defers to the special master on the weighing of evidence and determinations of credibility. And the Sanchez case, which was cited here today, that case involves circumstances that are a little different than the circumstances we have here. And those circumstances are that in Sanchez the family testified and it was a causation issue. It was not a vaccine administration issue. It was a causation issue. But the family testified and the special master said that their testimony was credible and credited the testimony. There was no evidence in the record that contradicted the testimony about arm contusions, which was the fact issue there, whether there were arm contortions in a certain period of time. And so there's no contradictory evidence in the record and the special master in the Sanchez case credited the testimony of the family. But then in his finding of fact found that the arm contortions didn't occur. And so what the federal circuit found in that case was arbitrary and capricious because it was inconsistent with the only evidence in the record. It was unfounded and the special master had not explained his decision. And so that's very different from here where we have the special master who is reviewing all of the evidence. She has discussed the evidence that she finds supportive. She's discussed why she found it supportive. She's discussed the evidence that contradicts the administration of the vaccine and talks about that. And then she ‑‑ Could she have and should she have explained why this litany of documents that are either incorrect or don't exist, while it's plausible to have that? She could have certainly done anything in her decision and included those kinds of explanations. But was she required to under the case law? And I would submit that she is not because what the case law requires is a rational basis for her decision. Her decision was that the vaccine was given on December 21, 2015. The case law doesn't require a rational basis for each item that she weighs of evidence. She talked about each item of evidence. She made it clear that she had reviewed the entire record. Yes, Judge Cunningham? What is your best case that you pointed to for the level of explanation provided by the special master? Is there a favorite case you have to point to in that regard? Well, certainly, I mean, the Kirby case which talks about both the fact that what the standard of review is in an arbitrary capricious case and how that is a deferential standard. But also, it talks about how medical records are not presumed accurate and  And it acknowledges that physicians make mistakes. And also, that physicians don't include much of the information they're given in an appointment in a medical record. But also, looking at the issue of the later records, which appellants have said should hold less weight because they were the later occupational therapy and physical therapy records. Appellants have argued they should hold less weight because they were created after the time that the petitioner was looking into litigation or had found out about the connection between the flu vaccine and GBS. And what the special master is required to do in those situations is weigh that evidence. And so, there are many, many vaccine administration cases where you have post injury later records that indicate the administration of a vaccine where earlier records didn't. And those are accepted and acceptable as supportive evidence, cooperative evidence of testimony of a vaccine administration. And, you know, we have the Riddick case, which is a case where there are five years before any record mentions the vaccine. And then at seven years, there's one note five years later. And seven years, we have two notes, which the special master acknowledged were litigation during the litigation time period and that those notes were supportive. And you have the Millett case, which talks about how litigation, which is this court's decision, talks about how litigation-driven evidence can still be weighed. It might be less persuasive, but it's still part of the weighing. And so, here, the special master weighs, and I see I'm over my time, so. It's okay. We can continue. We've asked a lot of questions. Just here, the special master weighed the evidence. It was her job to consider the evidence, to examine the evidence, to consider the credibility of the witnesses. She had the opportunity to observe and question Ms. Hinton. And she made it clear in her decision that she had considered all of the record evidence. Yes, Judge Cunningham. Just one discrepancy that I don't know we've talked a lot about, but I want to at least get your take on this. My understanding was Ms. Hinton alleged that a nurse named Michelle, who came in my back, administered the flu shot to... You hear me? I hear you now. Can you repeat your question? Oh, sure. Yes. My understanding is that Ms. Hinton alleged that a nurse named Lisa administered the flu shot. But my understanding was the doctor was not ever employing a Lisa. Is that your understanding as well? Yes, that is what the record reflected. Okay. So, can you just tell me what your take is on what the special master did with this sort of discrepancy and all of that? I just want you to speak to that a little bit. And while the special master examined the evidence, had the ability to determine that the testimony was credible, that doesn't require her to credit every piece of that. That doesn't require her to weigh every piece of that the same. Ms. Hinton did testify that it was a nurse named Lisa, and she continued to testify that the nurse was not being questioned. I'm not sure that who the exact nurse was takes away from the other cooperative evidence that there was a visit that day that Ms. Hinton observed someone give her child a shot, and that her testimony of things that happened after that, when she went back to pick up her daughters and she testified that they noticed that her son's hoodie was off and his sleeve was rolled up and there was a band-aid on his arm. All of those things were details that supported the credibility of her testimony. And so the special master may have weighed those issues. That may have weighed her or caused her weight of the testimony itself to be different. But the special master wasn't required to discuss what exact items she credited or didn't credit in Ms. Hinton's testimony. She did discuss the fact that she found it credible. She did discuss that there was other cooperating evidence that she felt supported that testimony. And she stated her rational basis for her decision that more probably than not, that the vaccine was administered. Which wasn't true. That's my recollection. Either the special master or the transporter both said this is a very thin case. That was the special master and she said that there was barely enough evidence to satisfy the preponderance. The special master is recognizing that it's just paper thin. Right? She is recognizing. She is recognizing what the... Doesn't that recollection alone tell me that the special master put on, into the balance, all the evidence the government is arguing favor its case? I would agree with that, your honor. She definitely notes the contradictory evidence. She definitely... And you're saying there's no law that says the special master has to explain why they choose one side over the other? She claimed why she chose one side over the other. She explained the rationale for her decision, but she didn't have to explain why she chose one piece of evidence to have slightly less weight and one piece to have slightly more. I don't think there's any case law that says she needs to go through and list every piece of evidence and give it an assignment of a weight in her decision. What's missing that would have been very helpful to your side had it been in the special master's opinion was a sentence that says something like, the real question here in my mind is whether the vaccine was given. I'm satisfied that she did go to the meeting on the 21st for the reasons I said earlier. So then the question was, was the vaccine given? And I recognize that sometimes records are imperfect. So the question is, well, is this an imperfect case or is this a case where Ms. Hinton's not telling the truth? I tend to want to say it's Ms. Hinton's telling the truth. If the opinion said that, then we would have the link would be put together, right? That is correct. There would be a reason for crediting or the weight of the testimony on those particular pieces of evidence, those particular medical records that were the hospital records or something of that nature. But the special master certainly acknowledged that that evidence was in the record. And she made it very clear that she acknowledged that there was this contradictory evidence and that she weighed it. And then she found that it met the preponderance standard. And by the time the special master is deciding that case, she knows it's a table injury. That's correct. Any further questions? Any further questions? No. Thank you. Thank you. Okay. Thank you very much, Ms. Wade. Thank you. I will give you your three minutes of rebuttal time. Thank you. Briefly, just to begin, I wanted to note, I believe, a point when counsel mentioned that the special master didn't really place any of her inferences on the record and that these are simply, if she implied that these are simply assumptions that I am submitting that she must have inferred X, Y, and Z, this sort of laundry list of unreasonable assumptions. But the Court of Federal Claims did agree with respondent in one respect, which is that by accepting Ms. Hinton's testimony, she necessarily found, must have found, that those other records regarding the offices on December 21st and the hospital records were inaccurate. And I would submit that the evidence is, the testimony of Ms. Hinton and the medical record evidence are... Which ones were inaccurate? I'm sorry, what's that? Which records were inaccurate? The records from the no-show, saying that Ms. Hinton was a no-show. And then the hospital records from February of 2016. Yes. And so... Can I ask you a question? Sure. This is, I don't, your argument that you're making right now in relying on the Court of Federal Claims, I hadn't thought about your reliance on the Court of Federal Claims, but are we bound by that? I mean, I thought that we were reviewing de novo, the special master's determination, whether it's arbitrary and capricious. You are. You are. I'm just pointing out that the point that I am making was acceded to by the Court of Federal Claims, not that this Court is bound by it. But just simply, I would suggest that the inferences that I'm suggesting were unreasonable, that these are corollary inferences, that by crediting the testimony of Ms. Hinton, you have to make these inferences, they're not optional. Couldn't you say this, my gosh, this is a really hard case. On the one hand, I got this. On the one hand, I got that. It's really close. There are a lot of what you call questionable occurrences in this case. But ultimately, when I look at the record, given what I have, and I can only review what I have in front of me, I've decided that I'm going to credit Ms. Hinton because her testimony is detailed, because her actions are consistent with someone who thinks they're telling the truth. And why, you know, like sometimes I look at things as a judge, and it's hard to decide. And I say, well, I think the answer that's most consistent with the record is X. And why isn't it good enough to say, look, I think the answer that's most consistent here is, or the one that's most likely, is that there's, you know, evidence, by preponderance of the evidence, it's satisfied to me that a vaccine was administered. And the record's not perfect, this is really hard. But why isn't that enough? Because the court did not explicitly explain why, and there's no evidence that would support the inference that the contemporary's records are incorrect. That can be the case. It is not always the case that medical records are credited, but usually it's because there is some basis in the record. So you would say that in a circumstance where there's medical records, and versus testimony, that the special master has no choice in those cases but to say that the witness must be with the medical records. The court, the special master has no obligation to weigh in on the state of mind of Ms. Hinton. Ms. Hinton might have a firmly held belief that everything happened exactly as she said. I don't comment on that, and I'm not speculating as to that. But when we have guidance from this court about the trustworthiness of medical records, and we have guidance from this court and the United States Supreme Court that testimony, like she credited in this case, is inherently deserving of little weight, then I think in these circumstances, as a factual matter, the court is obligated to provide some explanation, much as the court found that the special master was obligated to, had failed to provide a rational basis for his decision to reject the testimony of family members in that case. In terms of, I think, going back to whether or not the respondent has cited any authority, the authority that the special master has to articulate a rational basis is in the standard of review itself. And in Palak, this court has said that this court has a duty to ensure that that has happened. The difference, I think that both parties agree that under the standard, the special master has to articulate a rational basis. The differences that Ms. Hinton's lawyer suggests, or I guess it's Mr. Hinton's lawyer, suggests that that is satisfied here, because all that's needed is a rational basis for the fact-finding, not a rational basis for each and every weighing provided. And I guess I would say that that is not supported by this court's decision in Sanchez. I mean, that was a specific... Your view is that there has to be a discussion of each and every piece of evidence and why any amount of credit weight is given. No, what is it? Not each and every piece of evidence, but I think it's a case-by-case analysis. In that case, the circumstances that required the special master to explain why he was rejecting the evidence wasn't because the evidence was entitled to some presumption of accuracy. It was because of how he treated the rest of the evidence, that in those circumstances he was required to provide an explanation. In these circumstances... What if the explanation was, I've looked at all the evidence and I find that Ms. Hinton's testimony is more credible? I think that the court would still... Which is... My position... I'm just... That's okay. My position would still be the same, that given the guidance from this court, when you're talking about taking, elevating testimony, that the elephant in the room here is that all of the efforts that Ms. Hinton undertook, all of the statements that she made, were made after she retained an attorney. She retained an attorney in March of 2016, and according to her testimony, he directed her then to go and gather records. He signed the retainer agreement on the 21st of March. On the 5th of April, she requested that her son's medical records be changed to reflect a vaccination had occurred. And then on the 12th of April, she represented during... In a physical therapy, the medical records that we've referred to, where she represented that her son had received a flu vaccination. There is no case that I'm aware of that has credited the statements that were made with litigation in mind. And I would direct the court's attention to Grote versus HHS, as well as Riddick versus HHS. In both of those cases, the special master credited subsequent medical records that referred back to a vaccination. So, similar in terms of an individual reporting to their doctor that they had received the vaccination earlier in time, not contemporaneous to the vaccination itself. And no actual vaccination record was available. Let me just finish my... I'm sorry. The point that I want to make about these two cases is that in both cases... Well, you haven't heard anybody ask you questions because you've run on and on and on. You've made your point. No, I haven't. The point is that in both cases, the court recognized or the special master recognized that those records were created prior to the initiation of litigation. And what I'm trying to tell you is that the government's now asking for a presumption that if someone testifies after they've retained counsel, we can assume that they're not telling the truth. That's not accurate, but what I would say is that... Well, the hint of what you said is that. This court has recognized that those records that are made by statements that are given by interested parties are deserving of little weight. They deserve little weight. That's not me saying that. That is from this court and from the United States Supreme Court saying that. And that is what the court... That's what the special master credited in this case. And to not explain that is the fundamental issue in terms of not providing a rational explanation. That we're not talking about just any evidence. We're talking about evidence that this court has given very specific guidance as to how statements made once you've retained an attorney should be treated compared to contemporaneous medical records. I don't want to... So the case boils down after all this argument. It's a simple question of whether or not the special master is obligated to explain why they give more than little weight to testimony from the interested party. I agree that that is one ground. The other would be the implausible inferences that flow from crediting that testimony. So there would be two separate grounds. Under the arbitrary and capricious standard of review, the issue is whether or not the special master considered the relevant evidence, drew plausible inferences, and articulated a rational basis. And I'm arguing that those final two factors were not met. I just want to... My final point, and I will end here, is I think factually the most similar case and the most relevant case is a case from the Court of Federal Claims sent to Mahe'i, which is documented in the... Is that cited in your brief? It is cited in my brief, yes. It is a very factually similar case to this. What's it called? Sent, Mahe'i v. Health and Human Services. And the citation is 32, Fed Claims 612. 32, Fed Claims? Fed Claims 612, yes. And in this case, the evidence was very similar. The mother testified she took her child to the doctor, that she witnessed the child receiving a vaccination, that she had engaged in a conversation with her provider, and that subsequently she went to her friend's house. I apologize. I know I'm... We have the case. Do you have any further questions, Judge Cunningham? Do you have any questions, Judge Cunningham? It's harder than your reply. Pardon me? It's harder than your reply. It is. Okay. All right. Thank you for your argument. We thank both parties. And the case is submitted.